STATE OF CONNECTICUT *v.* BILLY JACKSON
(AC 25137)

Schaller, Gruendel and Stoughton, Js.

Argued January 10—officially released May 16, 2006

*Michael S. Alevy*, assistant public defender, with whom was *Elizabeth M. Inkster*, senior assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Jonathan C. Benedict*, state's attorney, and, on the brief, *Howard S. Stein*, assistant state's attorney, for the appellee (state).

*Opinion*

STOUGHTON, J. This is an appeal by the defendant, Billy Jackson, who was convicted after a jury trial on four of the five counts against him. He was charged in a substitute information with two counts of attempt to commit murder, both in violation of General Statutes §§ 53a-49 and 53a-54a (a), one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), one count of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (5), and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a). The jury found the defendant not guilty of one count of attempt to commit murder and guilty of all of the other charges. He has appealed from the judgment of conviction rendered on the verdict.

On appeal, the defendant claims that the trial court improperly (1) denied his objection to the prosecutor's peremptory challenges of minority venirepersons and

(2) precluded evidence of the violent character of one of the victims, and further claims (3) that he was denied a fair trial due to prosecutorial misconduct. We affirm the judgment of the trial court.

The jury reasonably might have found the facts set out hereafter. On the evening of September 21, 2002, the defendant was at an establishment in Bridgeport called the Small Games Club (club). The victim, Terry Mooney, and his friend, Troy Robinson, were also at the club. Sometime during the course of the evening, the victim was carrying some drinks from the bar to rejoin his friends when he bumped into the defendant. The club's bouncer noticed the incident and, later, when he heard the victim and the defendant arguing in the bathroom, escorted the defendant out of the club. The defendant remained outside the club. When the bar closed, the victim went outside to meet Robinson. The victim overheard the defendant, who was still outside the club, talking about him. The victim approached the defendant, whereupon an argument began. The victim saw the defendant reach into his pants and, thinking that the defendant was going to pull out a gun, punched the defendant. A fight developed between the two men, during which the victim was shot in the right thigh. The defendant then got up and shot Robinson. Robinson and the victim struggled with the defendant. The defendant fired again, and the bullet struck the victim in his right shoulder. At some point, it became apparent that the gun was no longer operable, whereupon the victim and Robinson left.

The defendant was charged, and the matter was tried to the jury. He was convicted of one count each of attempt to commit murder, assault in the first degree, attempt to commit assault in the first degree and criminal possession of a firearm and received a total effective sentence of twenty years imprisonment. The defendant now makes three claims on appeal, each of which will

be addressed in turn, with additional facts relevant to each claim set forth as necessary.

## I

The defendant, who is African-American, first claims that the prosecutor's use of peremptory challenges to strike prospective jurors improperly discriminated against members of minority groups and deprived the defendant of a fair trial in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and *State* v. *Holloway*, 209 Conn. 636, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). We disagree.

Before addressing the merits of the defendant's claim, we set forth the well established legal principles, recently reiterated by our Supreme Court, that govern our review. "Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. [One of these factors is whether] the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 408–10, 886 A.2d 404 (2005).

The following additional facts are relevant to our resolution of the defendant's claim. The record shows that a jury of six persons with two alternates was selected for the defendant's trial. The jury selection for the defendant's trial took place over four days, during which forty-seven venirepersons were sworn. Of the forty-seven venirepersons sworn, twenty-seven were dismissed by the court for cause, leaving a pool of twenty eligible venirepersons. In total, the state exercised five of its peremptory challenges, four of which were challenged by the defendant as discriminatory under *Batson*. The court heard the parties' arguments and considered the merits of the defendant's *Batson* challenges as each was raised. The court determined that the first three *Batson* claims raised by the defendant were without merit. Regarding the fourth *Batson* challenge, the court made no explicit finding of discriminatory intent, but nevertheless rejected the state's reasoning for challenging the prospective juror and sat her as an alternate.

On appeal, the defendant asserts that the court's denial of his objection to the state's three peremptory

challenges was clearly erroneous because (1) the non-discriminatory reasons given by the state for each challenge were pretextual, and (2) the court made an implicit finding of pretext in the state's peremptory challenge when it chose to seat the alternate juror, M,[1] which, combined with the state's disproportionate number of challenges against minority venirepersons, required the court to reexamine more closely the state's motives with regard to the other three challenges. The defendant asks that this court vacate his conviction and order a new trial.

## A

We first address the propriety of the state's exercise of each of the three peremptory challenges that gives rise to the defendant's *Batson* claims. We conclude that, with respect to each challenge, the court's rejection of the defendant's *Batson* claim was not clearly erroneous.

## 1

### Venireperson R

On the first day of jury selection, the state exercised its first peremptory challenge to remove R, an African-American female, from the venire panel. The defendant asked for the expression of a race neutral reason for the challenge, whereupon the state proffered several concerns. The prosecutor noted that R (1) had difficulties understanding the burden of proof, initially indicating that she would require absolute certainty to convict for a serious crime, (2) thought she had been unfairly treated by police when she had been arrested in New York for operating under a suspended license and (3) had a nephew who had stabbed somebody in New York. The defendant then sought to rebut the state's proffered

---

[1] For each venireperson, we use that individual's initial to protect his or her legitimate privacy interests. See, e.g., *State* v. *Peeler*, 267 Conn. 611, 620 n.9, 841 A.2d 181 (2004).

reasons. After hearing the parties' arguments, the court rejected the defendant's *Batson* challenge. In support of its ruling, the court noted that R had made inconsistent statements with respect to her feelings about her encounter with police and about whether she would be able to hold the state to the applicable burden of proof.

We agree with the state that the record supports the court's finding that the reasons given by the prosecutor for excusing venireperson R were legitimate. The state's first reason for exercising its peremptory challenge, which was that R had difficulty understanding the state's burden of proof, has been recognized by our courts as a valid, nondiscriminatory reason for excusing a venireperson. See *State* v. *Hodge*, 248 Conn. 207, 232–33, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). Regarding the state's second and third bases for challenging R, we note that "[p]rosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government. . . . [T]his concern constitutes a neutral ground for the state's exercise of a peremptory challenge . . . ." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). The court determined that the reasons proffered by the prosecutor were not pretextual. "Cognizant of our inability to consider [the venireperson's] credibility in the calculus on appeal, we give great deference to the ruling of the trial court in this regard." Id., 15.

2

Venireperson G

The state's second peremptory challenge was to G, an African-American male, on the second day of voir dire. The defendant moved to have the prospective juror seated under *Batson*. When asked to proffer a nondis-

criminatory reason for the challenge, the prosecutor stated that he believed that the substance of G's responses to questioning indicated (1) that he would hold the state to a higher burden of proof and (2) that he had a lack of respect for the state's case. The defendant responded by contesting the state's characterization of G's answers.

The court, in ruling on the *Batson* challenge, considered G's testimony[2] and concluded that, although in its view, G's difficulty with the reasonable doubt standard had been straightened out, his testimony was inconsistent enough for the state to "feel a little uncomfortable" with seating him as a juror.[3] Indeed, "[a] prosecutor, when exercising a peremptory challenge to remove a venireperson, may legitimately [base that decision] not only on answers given by the prospective juror to questions posed on voir dire, but also on the prosecutor's observations of the prospective juror. An impression of the conduct and demeanor of a prospective juror

[2] A review of the transcript indicates that during voir dire, the prosecutor asked G whether, given the seriousness of the crimes charged, he would need to be 100 percent convinced of the defendant's guilt in order to convict. In response, G stated that, given the seriousness of the charges, he would expect that the state "would have its stuff together," that a guilty verdict means that "you're going to be putting someone away for a long time" and that he would assume that the state would not be coming at it "half-cocked . . . ." After an objection by the defense to the state's continued questioning of G on the topic, the court intervened and asked G whether he would be able to follow the court's instructions regarding the burden of proof despite the serious charges of the case. G answered that he would follow the instructions of the court.

[3] Specifically, the court made the following ruling with respect to the challenge: "I found [G] to be quite good. I think he answered the questions very well, forthright. There was some difficulty with reasonable doubt. There was some difficulty, which I think eventually was straightened out, but questions revolving around that particular subject, while they were straightened out and would not put the state in a position where [it] could ask for the venireperson to be excused for cause. I think it is enough for the state to perhaps feel a little uncomfortable. And based on the prior rulings by this court and the choices made by the state, I feel that that is an adequate nonracial reason for exercising the peremptory challenge at this point."

during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge. . . . Thus, a prosecutor's explanation that a venireperson was excluded because he or she seemed, for example, inattentive or hostile to the government, if credible, is sufficient." (Internal quotation marks omitted.) *State* v. *Clark*, 62 Conn. App. 182, 200, 774 A.2d 183 (2001), aff'd, 260 Conn. 813, 801 A.2d 718 (2002). The court found the prosecutor's legitimate, nondiscriminatory reason to be credible. In making that determination, the court carefully reviewed the racial composition of the jury pool, noting that the prosecutor had excused only one other African-American venireperson and that another African-American had been accepted onto the jury panel. The court stated that it saw no discriminatory pattern and assured the defendant that it would continue to watch closely to see if a pattern did emerge. Because there is evidence in the record to support the court's conclusion that the peremptory challenge of G was not motivated by race, we cannot say that the court's decision was clearly erroneous.

### 3

### Venireperson A

The third venireperson peremptorily excused by the state was A, a Hispanic female. The defendant moved to have her seated under *Batson*. The prosecutor expressed his concern over A's ability to judge fairly the credibility of the police officers who would be testifying at trial, on the basis of her statement that she had a family member who she believed had been treated unfairly by the police, and the troubling laugh she had made during that response. In rebuttal, defense counsel did not dispute the fact of A's statement to that effect, but argued that despite that statement, she had stated that she was satisfied with the way in which the family member's case was resolved.

The court reviewed A's testimony and determined that, in light of the importance of the police testimony to the case, the reason given by the state for the challenge was not pretextual and was valid. The court was correct in concluding that the prosecutor's basis for exercising the challenge was legitimate. "Courts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prosecuted because of the real possibility that the venireperson may harbor resentment against prosecuting authorities generally." *State* v. *Hodge*, supra, 248 Conn. 231. The court again reviewed the composition of the jury pool for evidence of a discriminatory pattern. It observed that A was the third Hispanic venireperson to be called and that she was the first Hispanic venireperson to be peremptorily challenged by the state and concluded that there was no pattern of discrimination. The court found that the state's reason for challenging A was not pretextual, which we cannot conclude was clearly erroneous.

## B

The defendant raised a fourth *Batson* challenge to the state's exercise of its fifth[4] peremptory challenge against M, a Hispanic woman. The court, after hearing arguments for and against the challenge, decided to seat M as an alternate juror. On appeal, the defendant claims that the court's seating of M constituted a finding of pretext and that, on the basis of that finding, the court should have revisited its rulings on the three prior *Batson* challenges. The defendant contends that the court's failure to reconsider its three prior *Batson* rulings amounted to a structural error warranting a new

---

[4] On the third day of voir dire, the state exercised its fourth peremptory challenge against J, a Caucasian female, which was not contested by the defendant.

trial.[5] We disagree that the court was required to revisit its prior *Batson* rulings and conclude that the defendant's failure to request reconsideration of those rulings renders our record inadequate for review of his claim.

The following additional facts are relevant to the defendant's claim. In response to the defendant's motion to seat M under *Batson*, the prosecutor proffered a nondiscriminatory reason for the challenge. He stated that his problem with M was solely due to her limited education and inability to understand and communicate in the English language.[6] Counsel for the defense, in rebuttal, argued that M had responded correctly to all of the questions asked of her and had showed no inability to understand the English language.

In response to the defendant's motion to seat M as an alternate, the court made the following ruling: "The mere fact of [her] seventh grade education in itself is certainly not a per se disabling circumstance. She . . .

[5] To the extent that the defendant argues that the court, after seating M and observing that 80 percent of the peremptory challenges exercised by the state were against minority venirepersons, should have ordered a new trial, we have stated that "when a defendant is found to have sustained his burden of showing a *Batson* violation, the better practice is to leave it to the discretion of the trial court to fashion the appropriate remedy, depending on the circumstances of the particular case." *State* v. *Morales*, 71 Conn. App. 790, 813 n.27, 804 A.2d 902, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002).

Further, assuming that the court properly found that the state had committed a *Batson* violation, the defendant cannot escape the fact that he received the exact remedy that he had requested at trial. See id. The defendant moved to seat M on the jury panel, and the court granted that motion. When the court asked defense counsel, "You want her to sit . . . ?" Defense counsel answered, "Yes, Your Honor." Following that exchange, defense counsel made no motion pursuant to *Batson* to strike the entire jury panel and begin the process anew.

[6] The prosecutor cited, in particular, M's statements that she could not understand parts of the juror orientation film and some of the judge's comments. He expressed his concern that M would have difficulty understanding the technical testimony of the expert witnesses and communicating adequately with the other jurors during their deliberations.

seems quite bright. . . . She did indicate that she didn't understand some of what I said. She indicated that the first time through. Then, the second time through, she said that she did understand everything. . . . She, in my mind, answered the . . . questions . . . in a reasonable manner and in an intelligent manner . . . and I don't find that there is any reason that she . . . not be accepted. . . . [T]here are no Hispanics on the jury. She is the fourth Hispanic to come up. One was for cause, one was excused by the defendant, and this is the second female excused by the state. I don't find any reason in her answers that she . . . should be excused, and therefore I'm going to seat her as a second alternate."

The defendant claims that the court's ruling to seat M constituted a finding of pretext for discrimination because it was made in response to his *Batson* challenge. The state argues that the court did not make a finding of discrimination when it sat M but treated the state's challenge as one for cause. Even if we assume arguendo that the court did make a finding of pretext when it sat M as an alternate juror and that such a finding was proper,[7] the defendant's claim cannot suc-

---

[7] Nonetheless, on this record it appears that the court's decision to seat M was predicated on an improper application of *Batson*. See *State* v. *Mukhtaar*, 253 Conn. 280, 291 n.13, 750 A.2d 1059 (2000). It appears that the court decided to seat M because it disagreed with the prosecutor's reasons for exercising the peremptory challenge. The record clearly indicates that M stated that she had difficulty understanding and communicating in English. The court acknowledged her testimony to that effect, yet decided to seat M, stating that it disagreed that she would be unable to participate adequately as a juror. The relevant inquiry, however, was not whether the court agreed with the state's proffered reason, but whether the reason was legitimate and not a pretext for discrimination. See *State* v. *Wright*, 86 Conn. App. 86, 96–97, 860 A.2d 278 (2004). The court made no explicit finding of pretext, however, and its analysis regarding the absence of a Hispanic juror on the panel suggests that it was concerned more with seating a Hispanic venireperson than with preventing the state from improperly exercising a challenge.

ceed because, following the court's seating of M, defense counsel did not request that the court reconsider its three prior *Batson* rulings in light of the newly transpired events.

Our Supreme Court has made clear that a court, after seating a juror in response to a motion under *Batson*, is not required to revisit, sua sponte, its prior *Batson* rulings. "[T]he defendant, not the trial court, properly bears the burden of raising the issue of whether the court's subsequent finding of pretext calls into question the validity of the court's earlier ruling[s] upholding the state's use of a peremptory challenge against a previous venireperson. Of course, if warranted under the circumstances, the trial court may, sua sponte, reconsider its previous ruling rejecting the defendant's earlier *Batson* challenge. Moreover, the defendant is free to seek reconsideration of any such ruling at any time prior to the conclusion of jury selection. See *State* v. *Robinson*, [237 Conn. 238, 250, 676 A.2d 384 (1996)]. In light of the significant period of time that it often takes to select a jury and the large number of potential jurors frequently involved in that process, however, it would be unfair to *require* the court to undertake a sua sponte review of its prior *Batson* ruling or rulings solely because the court thereafter determines that, with respect to a subsequent venireperson, the prosecutor's explanation for exercising a peremptory challenge does not pass muster under *Batson*." (Emphasis in original.) *State* v. *Mukhtaar*, 253 Conn. 280, 292, 750 A.2d 1059 (2000).

Following the court's seating of M, defense counsel did not ask the court to revisit its rulings regarding the three prior *Batson* challenges. Defense counsel was obligated to make known to the court his new claim under *Batson*, which was predicated on additional facts that were unavailable at the time the court made its prior rulings. A defendant waives his right to make a

particular *Batson* claim when he fails to make that claim before the jury has been sworn. *State* v. *Robinson*, supra, 237 Conn. 250. Further, pursuant to *State* v. *Golding*, 213 Conn. 233, 240, 567 A.2d 823 (1989), appellate courts will not review unpreserved *Batson* claims that require a predicate factual determination. See *State* v. *Hodge*, supra, 248 Conn. 228 ("[b]ecause a disparate treatment claim raises factual questions that must be decided by the trial court, the defendant's failure to raise the claim in the trial court is fatal to his claim on appeal"); see also *State* v. *Young*, 76 Conn. App. 392, 399, 819 A.2d 884, cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003). Accordingly, we decline to review the defendant's claim.

II

During his case-in-chief, the defendant offered the opinion testimony of Terry Rankin, an acquaintance of the defendant and frequent patron of the club, for the purpose of establishing that the victim had been the aggressor in the altercation. The court determined that the witness was not qualified to give an opinion as to the victim's character. The defendant, in his second claim on appeal, contends that the court abused its discretion in excluding the testimony. We do not agree.

The following additional facts assist us in resolving the defendant's claim. The court held a hearing outside the presence of the jury to determine whether there was an adequate foundation for Rankin to state his opinion as to whether the victim had a propensity for violence. At the hearing, Rankin testified that he knew the victim only by sight, having seen him at least six times at the club. He stated that each time he had observed the victim at the club, the victim appeared intoxicated and argumentative and that on two occasions he had seen the victim escorted out of the club for behaving aggressively toward other patrons. Rankin

admitted that although he had observed the victim strike the defendant on September 21, 2002, that was the only time he had seen the victim exert physical force on another person in the club.

Following this testimony, the court determined that the defendant had laid an adequate foundation that he had acted in self-defense with respect to the victim.[8] The court then considered the defendant's offer of proof concerning Rankin's knowledge of the victim's violent character. The court observed that although Rankin testified that he had seen the victim approximately six times at the club, he had seen him behave aggressively on only two occasions. The court determined that those two observations were not sufficient for Rankin to have formed an opinion as to the victim's propensity for violence. Accordingly, the court refused to permit Rankin to offer an opinion as to the victim's violent character.

Section 4-4 (a) (2) of the Connecticut Code of Evidence permits the accused in a homicide or criminal assault case, after laying a foundation that he acted in self-defense, to offer evidence of the violent character of the victim to prove that the victim was the aggressor.[9]

---

[8] Despite the defendant's contention otherwise, the court expressly made this determination. It stated: "The exception in § 4.4 (a) (2) [of the Connecticut Code of Evidence], again, reads . . . [e]vidence offered by an accused in a homicide or criminal case . . . after laying a foundation that the accused acted in self-defense, *which there has been such a foundation laid as to this particular victim* . . . of the violent character of the victim to prove that the victim was the aggressor . . . ." (Emphasis added.)

[9] Connecticut Code of Evidence § 4-4 provides in relevant part: "(a) Character evidence generally. Evidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion, except that the following is admissible . . .

"(2) Character of the victim in a homicide or criminal assault case. Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused. . . ."

See *State* v. *Whitford*, 260 Conn. 610, 638, 799 A.2d 1034 (2002). "Subsection (b) of § 4-4 provides that proof of the victim's violent character may be made through reputation or opinion testimony or by evidence of the victim's conviction of a violent crime."[10] Id.

"A party seeking to present opinion testimony must demonstrate that its witness has had sufficient contact with the [person] who is the subject of the opinion and, on the basis of such contact, has formed an opinion with regard to that person's [character]." *State* v. *Holley*, 90 Conn. App. 350, 368, 877 A.2d 872, cert. denied, 275 Conn. 929, 883 A.2d 1249 (2005); see also *State* v. *Egan*, 9 Conn. App. 59, 63, 514 A.2d 394 ("[t]o lay an appropriate foundation for the introduction of opinion testimony, a party must show that the witness providing the testimony has a deliberate opinion formed as the result of personal contact and experience" [internal quotation marks omitted]), cert. denied, 201 Conn. 811, 516 A.2d 886 (1986). "Whether a witness has had sufficient contact with a person to be qualified to testify as to a particular character trait is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Internal quotation marks omitted.) *State* v. *Holley*, supra, 368.

"Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a

---

[10] Connecticut Code of Evidence § 4-4 (b) provides: "Methods of proof. In all cases in which evidence of a trait of character of a person is admissible to prove that the person acted in conformity with the character trait, proof may be made by testimony as to reputation or in the form of an opinion. In cases in which the accused in a homicide or criminal assault case may introduce evidence of the violent character of the victim, the victim's character may also be proved by evidence of the victim's conviction of a crime of violence."

new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *Pasiakos* v. *BJ's Wholesale Club, Inc.*, 93 Conn. App. 641, 646, 889 A.2d 916, cert. denied, 277 Conn. 929, 896 A.2d 101 (2006). To prove that the court's abuse of discretion was harmful, the defendant must demonstrate that the court's ruling either more probably than not affected the result of his trial or was so substantial as to undermine confidence in the fairness of the verdict against him. See *State* v. *Gonzalez*, 272 Conn. 515, 527, 864 A.2d 847 (2005).

We conclude that the court did not abuse its discretion in determining that Rankin had not had sufficient contact with the victim to form the basis for an opinion as to his violent character. Compare *State* v. *Holley*, supra, 90 Conn. App. 369 (held that court did not abuse discretion in disallowing opinion evidence for lack of sufficient foundation when witness had had only two instances of contact with victim). Even if the proposed testimony had been sufficient to demonstrate Rankin's knowledge of the victim's character, however, the defendant has not shown that the exclusion of the evidence caused him harm. See *State* v. *Gonzalez*, supra, 272 Conn. 527. Rankin's testimony regarding the victim's propensity for violence was simply not necessary because both parties agreed that the victim had been the aggressor. The victim himself admitted numerous times throughout his testimony at trial that he had thrown the first punch during his fight with the defendant, based on his belief that the defendant was reaching in his pants for a gun. The defendant also had the opportunity to testify that the victim had been the aggressor. The defendant testified that he was not reaching for a gun and that the victim had approached him outside of the club without provocation. Given the foregoing testimony elicited at trial, the jury was free to conclude that the victim had been the aggressor and that the defendant had acted in self-defense when he

shot the victim.[11] Although the jury rejected the theory that the defendant had acted in self-defense, we cannot say that the result would have been different had the court allowed the opinion testimony.

## III

The defendant's final claim is that during the course of final argument to the jury, the prosecutor engaged in repeated and strident misconduct by misstating the evidence and expressing a personal opinion as to the defendant's credibility. The defendant claims that prosecutorial misconduct deprived him of a fair trial under the state and federal constitutions. We do not agree.

"As a preliminary matter, we set forth certain relevant legal principles that guide our resolution of this issue. Our Supreme Court has advised that [t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . In analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. . . .

---

[11] The state contends that the defendant cannot claim that he was deprived of the opportunity to present a defense because the defendant, when asked by the court whether he wanted the jury to be charged on the initial aggressor theory of self-defense, stated that he did not care either way. We do not agree that the defendant was prevented from presenting such evidence. A party is permitted to present multiple and inconsistent theories in support of its defense. The court clearly found that such a foundation existed when it informed the parties that it was inclined to charge on self-defense on the basis of the victim's testimony that it was he who had first punched the defendant because of his fear that the defendant was reaching for a gun. Because the court had determined that an adequate foundation existed for the defendant to raise a self-defense claim, the defendant was free to introduce evidence in support of that claim. The fact that defense counsel had no opinion as to the charge is of no consequence.

Because most of the claimed prosecutorial misconduct occurred during closing argument, we set forth the applicable legal principles. "[P]rosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Boyd*, 89 Conn. App. 1, 29–30, 872 A.2d 477, cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005). "Only if we conclude that prosecutorial misconduct has occurred do we then determine whether the defendant was deprived of his due process right to a fair trial." *State* v. *Schiavo*, 93 Conn. App. 290, 302, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006).

With the foregoing in mind, we now turn to the defendant's specific claims. The defendant refers to remarks made by the prosecutor on three occasions that the defendant claims deprived him of a fair trial. We read each of the defendant's claims to allege the same type of misconduct, namely, that the prosecutor stated his opinion regarding the defendant's credibility and motivation to lie. Accordingly, we initially set forth our rule of law with respect to this particular type of misconduct. "There is no rule that precludes a prosecutor from challenging a defendant's testimony. The issue is whether the prosecutor's argument took the form of a fair criticism of a defendant's credibility on the basis of the evidence or if it reflected merely the prosecutor's

personal opinion of the defendant's credibility. . . . Our jurisprudence instructs that a prosecutor may comment on a witness' motivation to be truthful or to lie." (Citation omitted; internal quotation marks omitted.) *State* v. *Pedro S.*, 87 Conn. App. 183, 198, 865 A.2d 1177, cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005). "While a prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Jacobson*, 87 Conn. App. 440, 459, 866 A.2d 678, cert. granted on other grounds, 273 Conn. 928, 873 A.2d 999 (2005).

A

The defendant first alleges that the prosecutor's comments regarding the defendant's demeanor and gait constituted misconduct. During the state's closing argument, the prosecutor described the defendant's physical demeanor, noting that the defendant, on his way to the witness stand, "walked with a very pronounced and deliberate limp."[12] The defendant claims that the prosecutor's use of the word "deliberate" reflected the prosecutor's opinion and improperly suggested to the jury that the defendant was fabricating a physical disability to support his defense.[13] We disagree.

At trial, the defendant testified that he suffers from nerve damage in his right foot, which causes him to walk

---

[12] The prosecutor further stated: "He walked with a very pronounced limp. He had to rest on the lectern here, on the podium. Every time he got up to support his weight, because he wants you to think that he's not capable of engaging in this violent altercation that he claimed happened."

[13] Defense counsel objected to the prosecutor's argument, and the court overruled the objection. Defense counsel then moved for a mistrial on the basis of the prosecutor's characterization of the defendant's disability, which the court also denied.

with a limp.[14] In his closing argument, the prosecutor pointed out the inconsistencies between the defendant's testimony regarding the limitations his disability imposed on him and the testimony of other witnesses indicating that the defendant had been dancing inside the club[15] and actively had engaged in an altercation with the victim on the night in question. We agree with the court that the remark was based on the evidence and observations that the jury might make as to the demeanor and credibility of the defendant. The prosecutor's suggestion that the defendant's disability did not interfere with his ability to engage in the conduct of which he was accused was relevant to the state's case and was a reasonable inference that was based on the evidence adduced at trial.

## B

The defendant next claims that the prosecutor engaged in misconduct by suggesting that the defendant tailored his testimony to fit the physical evidence of a torn shirt worn by Robinson on the night of the altercation.[16] The defendant's primary theory of defense was

---

[14] The following testimony was elicited by the state during its cross-examination of the defendant:

"[The Prosecutor]: Now, when you've been moving back and forth around these various demonstrations, you walk with a pronounced limp; isn't that right?

"[The Defendant]: Yes.

"[The Prosecutor]: You have a hard time getting around?

"[The Defendant]: Hard time. I'm wearing a brace, too.

* * *

"[The Prosecutor]: So, that leg does not interfere with your ability to engage in . . . physical activity, does it?

"[The Defendant]: Yes, it do[es], when it moves."

[15] Conflicting testimony had been presented regarding whether the defendant had danced with a woman named Sophie that evening at the club and whether the altercation between the defendant and the victim was motivated by competition over Sophie's affections.

[16] The defendant cites the following remarks by the prosecutor as improper: "And I especially love the physical evidence pertaining to the shirt and the story that was attempted to be told to you by the defendant. The shirt that they continued to show you; first of all, they were very clear

that he had not been the shooter. He claimed instead that Robinson had possessed the gun and that the gun accidentally had fired during the altercation. In support of his theory, the defendant testified that he had ripped Robinson's shirt with his left hand as Robinson was on top of him, holding him by the neck with one hand and attempting to shoot him with the other. In his closing argument, the prosecutor sought to rebut this theory. Indeed, the remarks made by the prosecutor implied that the defendant had tailored his testimony to fit with the physical evidence of the ripped shirt. The prosecutor is permitted to make such an inference, however, when, as here, he did not state his personal opinion regarding the defendant's credibility, but raised the evidence presented at trial in a way that cast light on its weaknesses. See *State* v. *Pedro S.*, supra, 87 Conn. App. 199 ("[b]ecause the prosecutor based her comments on the evidence and asked the jury to use its common sense in evaluating the evidence in light of the defendant's likely motives, the argument was proper"). Consequently, the prosecutor's statements in this regard did not constitute misconduct.

## C

Finally, the defendant complains that the prosecutor improperly expressed an opinion on the defendant's credibility when arguing to the jury that the reason why the defendant had not claimed self-defense was because, as a convicted felon, he could not admit to possessing a weapon. Both parties were aware that the court was planning to instruct the jury on the issue of self-defense, and both parties addressed the issue in their closing arguments to the jury. The prosecutor cor-

to tell you that it was a reach back with the left hand and a reach around by the right hand. That enabled two things. It enabled [the defendant] to say that he saw a weapon, number one; and number two, it also is a way for the defendant's attorney to try to convince you that this rip here was a left sided grab."

rectly pointed out that the defendant had not presented any evidence regarding the use of deadly force against him and tied that fact to information he had elicited from the defendant on cross-examination, i.e., that the defendant was aware that as a convicted felon he was not permitted to carry a weapon. There is no language indicating that the prosecutor sought to present a personal opinion regarding the defendant's motivation to lie. Accordingly, we conclude that the prosecutor's argument was proper and was a reasonable inference that was based on the evidence adduced at trial.

Under controlling case law, it is overwhelmingly clear that none of the complained of remarks was improper. As such, we need not inquire into whether these remarks were harmful to the defendant. See *State* v. *Schiavo*, supra, 93 Conn. App. 302.

The judgment is affirmed.

In this opinion the other judges concurred.